**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

|  |  |  |
|---|---|---|
| CODE 3 EMERGENCY PARTNERS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | The Honorable Hilda G. Tagle |
| v. | ) | |
| | ) | Civil Action No. 2:18-cv-00441 |
| BLUE CROSS AND BLUE SHIELD OF | ) | |
| TEXAS, A DIVISION OF HEALTH  CARE | ) | (Removed from the District Court of Aransas |
| SERVICE CORPORATION, A MUTUAL | ) | County, Texas, 36ᵗʰ Judicial District, Cause |
| LEGAL RESERVE COMPANY, | ) | No. 18-0345) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff Code 3 Emergency Partners, LLC ("Code 3"), by its undersigned counsel, files

this First Amended Complaint as a matter of course, pursuant to Fed. R. Civ. P. 15(a)(1)(A), and

alleges as follows:

## I.    INTRODUCTION

1.    Plaintiff Code 3 operates freestanding emergency room facilities in five locations

throughout Texas -- Rockport, Mesquite, Carrolton, Denton, and the Dallas Forth Worth

International Airport.

2.    Defendant Blue Cross and Blue Shield of Texas, a division of Health Care Service

Corporation, a Mutual Legal Reserve Company ("Blue Cross"), is the largest health insurance

provider in Texas.   Code 3 regularly treats patients covered by health insurance plans sponsored

and administered by Blue Cross (the "Blue Cross Member") who seek emergency treatment at

one or more of Code 3's freestanding emergency room facilities.  Code 3 is required by law to

provide  emergency  treatment  to  all  patients  who  present  for  treatment  at  one  of  Code  3's

freestanding emergency room facilities.  Blue Cross, in turn, is required by law and the terms of the health insurance plans it sponsors and administers to reimburse Code 3 for the emergency treatment it provides to the Blue Cross Members, and within statutorily-mandated time periods.

3.    However, since Code 3 began operations in May 2015, Blue Cross has engaged in an aggressive campaign to wrongfully delay payment to, and steer its patient members (the "Blue Cross Members") away from, freestanding emergency rooms, including the Code 3 facilities. Blue Cross has done so in apparent furtherance of a strategy to run Code 3 and other freestanding emergency facilities out of business because they do not participate in Blue Cross's provider network and, therefore, are considered "out-of-network" or "non-participating" providers.  (See Affidavit of Carrie DeMoor, M.D. ("DeMoor Aff." or "DeMoor Affidavit"), at ¶ 7).[1]  While Code 3 has engaged Blue Cross numerous times in good faith attempts to become a contracted provider, Blue Cross refuses to offer Code 3 realistic reimbursement rates that would sustain its operations.  (Id.).

4.    Beginning in August 2018, Blue Cross implemented a new process, which it calls the "Emergency Benefit Management" process (hereinafter, "Blue Cross Process") for administering and adjudicating claims under most of its fully-funded plans and policies of insurance. (See DeMoor Aff., ¶ 3).  Fully-funded plans are those that Blue Cross Members purchase from Blue Cross for a premium, in exchange for health insurance benefits that are funded directly by Blue Cross.  (DeMoor Aff., ¶ 3).

---

[1] The DeMoor Affidavit, with exhibits, is contained within the materials annexed to Blue Cross's Notice of Removal as Exhibit A (ECF Doc. No. 1-1, pp. 27-386). All private health information has been redacted from the Exhibits attached to the DeMoor Affidavit.  Code 3 will provide unredacted versions to the Court and Blue Cross upon request.

5.      Specifically, under the Blue Cross Process, Blue Cross places a "lock" on and "pends" all claims for out-of-network emergency services for patients 12 months old and over covered by the applicable fully-funded plans.  This means that Blue Cross will automatically refuse to adjudicate these claims until it has received complete medical records and an itemized bill from the health care provider.

6.      Upon receipt of the requested items, a Blue Cross-employed licensed physician will review the claim to determine, after the fact, whether the patient believed he or she was having a medical emergency at the time the patient sought treatment at an emergency medical facility.

7.      While Blue Cross's communications relating to the Blue Cross Process state that it applies only to fully-funded Blue Cross Health Maintenance Organization ("HMO") Plans, Blue Cross has also been applying the Blue Cross Process to Code 3's claims covered under fully funded Blue Cross Preferred Provider Organization ("PPO") Plans.  (Blue Cross's HMO Plans and PPO Plans are collectively referred to herein as the "Blue Cross Plans").

8.      Code 3 provides emergent medically necessary services to Blue Cross Members, including those covered by the Blue Cross Plans.  (Id.).  After Blue Cross implemented the Blue Cross Process in August 2018, payments from Blue Cross to Code 3 dropped precipitously.  In just a matter of months, Code 3 had not been paid $495,511.67 it was owed on claims it submitted post-implementation of the Blue Cross Process for the emergency medical care it provided to Blue Cross Members covered by the Blue Cross Plans (the "Code 3 Claims").  (See DeMoor Aff. ¶ 3 and spreadsheet of the Code 3 Claims, attached as Exhibit A to the DeMoor Aff., at Exhibit A).

9.    Blue Cross's continued intentional payment delay tactics, implemented through the Blue Cross Process, seriously threaten Code 3's operations at its Rockport, Texas, location and elsewhere.  (See DeMoor Aff., ¶ 11).  Residents of Aransas County would be left without adequate access to emergency medical care if Code 3 went out of business.  (Id.).  This is not a far fetched possibility.  (Id.).

10.    For example, on October 1, 2018, Code 3 was forced to cease operations at a sixth facility in Craig Ranch due, in part, to Blue Cross's payment delay tactics and patient steering.  (Id.).  In addition, Code 3 has recently been forced to reduce physicians' salaries 25% at the Rockport facility due to mounting expenses and Blue Cross's failure to timely and accurately pay claims for the critical care rendered to Texas residents.

11.    Under Texas law, Code 3 must treat all patients who present to its freestanding emergency room facilities.  For fully-funded HMO and PPO plans, Blue Cross Members must, in turn, be held harmless by Blue Cross for any amounts beyond the copayment, deductible, and coinsurance percentage as if the Blue Cross member sought had treatment by an in-network provider or facility.  (Id.).

12.    Specifically, the Texas Free Standing Emergency Room statute and its regulations require freestanding emergency rooms to "provide to each patient, without regard to the individual's ability to pay, an appropriate medical screening, examination, and stabilization within the facility's capability, including ancillary services routinely available to the facility, to determine whether an emergency medical condition exists and shall provide any necessary stabilizing treatment."  Texas Health and Safety Code § 254.136; see also Texas Admin. Code § 131.46.

13.     Accordingly, to ensure that providers will not incur financial hardship as a result of the emergency treatment mandate, under the Blue Cross Plans and the Texas Insurance Code, insurers must cover emergency services at the same rate had the patient sought treatment at an in-network facility, according to the "prudent layperson standard."  The "prudent layperson standard" is met when a patient, an average layperson, seeks emergency medical treatment because he or she believes his or her health is threatened.  Tex. Ins. Code §§ 1301.155 and 843.002; see also DeMoor Aff. at ¶¶ 15-16.   Use of the prudent layperson standard in determining emergency insurance coverage is meant to encourage a patient to immediately seek medical treatment if they believe they are experiencing an emergency despite the financial implications.  (See DeMoor Aff. at ¶ 16).

14.     The Blue Cross Process requires, however, that for each claim submitted by Code 3 for reimbursement under the Blue Cross Plans, a Blue Cross employed physician perform a post-hoc second-guess review of patient medical records to determine whether, in fact, the patient believed, at the time he or she presented to the freestanding emergency room, that the patient was experiencing an emergent medical condition and that the prudent layperson standard was met.

15.     This review occurs only *after* the emergency services have been provided, and *after* the emergency services provider submits a claim for reimbursement of such services.  (See DeMoor Aff. at ¶¶ 18-19).  Not only does this review result in underpayments and delayed payments to Code 3, it puts the health and well being of Code 3's patients at risk by dissuading patients from seeking medical treatment in the event of a medical emergency, as evaluated under the prudent layperson standard.  (Id.).

16.     The Blue Cross Process also violates the Texas Prompt Pay Act ("TPPA") which requires Blue Cross to reimburse Code 3 within statutory time periods discussed further below. For those Blue Cross Plans covered by the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. ("ERISA"), the Blue Cross Process also violates Code 3's rights under ERISA, including Code 3's right to a full and fair -- and timely -- review of each claim.

17.     Importantly, almost immediately after Blue Cross implemented the Blue Cross Process, Blue Cross began to summarily deny Code 3's claims, indicating that Blue Cross allegedly needed additional information on Code 3 claims for reimbursement for services provided to Blue Cross Members under the Blue Cross Plans.  In order for Code 3's claims to be processed and paid by Blue Cross, two staff members must dedicate tens of hours of Code 3's limited administrative resources in order to gather the extensive additional documentation requested by Blue Cross to support of the medical necessity of the emergency services rendered. (See DeMoor Aff., ¶ 24). Code 3 must also incur the expense of copying thousands of pages of records and for postage related to the additionally requested information.  (Id.).  Eventually, when Blue Cross reimburses a claim, it pays Code 3 well below the rates required under the Blue Cross Plans.  (Id. at ¶ 24).

18.     In addition, in an apparent effort to further intimidate and harass Code 3, around the same time the Blue Cross Process began to impact Code 3, in or about August 2018, Blue Cross began directing medical records requests to Code 3's freestanding emergency rooms for Code 3's President, Dr. Carrie DeMoor and her family members who are insured by Blue Cross and had received emergent medical treatment at Code 3 facilities.  (See DeMoor Aff. ¶¶ 28-30). Blue Cross sent similar requests to other Code 3 physicians, including Dr. Peter Brokish, a physician at the Code 3 Rockport facility. (Id.).

19.     Blue Cross's aggressive delay in reimbursement to Code 3 for the emergent medical treatment provided to Blue Cross Members, and its other intimidation tactics, create a serious risk that Code 3 will not be able to continue operations without judicial intervention. (See DeMoor Aff. ¶¶ 11 and 32).  If Code 3 is forced to close its facilities, thousands of Texas residents will no longer have access to emergency medical care.  (Id. at ¶¶ 11 and 33).

20.     Accordingly, to prevent Blue Cross from causing imminent and irreparable harm, Code 3 sought, and obtained, an *ex parte* Temporary Restraining Order from the District Court of Aransas County, Texas, 36th Judicial District (Cause No. 18-0345), enjoining Blue Cross from applying the Blue Cross Process to the Code 3 Claims and future Code 3 Claims not yet submitted for reimbursement under the Blue Cross Plans.  (ECF Doc. No. 1-2).

21.     Now, following removal of this action to this Court, Code 3 seeks a preliminary injunction, followed by a permanent injunction, continuing the restraints imposed by the Texas District Court.

22.      Code 3 also seeks timely reimbursement of the Code 3 Claims and future claims submitted by Code 3, under the time limits required by the TPPA, and under the terms of the Blue Cross Plans.

## II.     PARTIES

23.     Code 3 is a limited liability company organized and existing under the laws of the State of Texas with a principal place of business in Frisco, Texas.  Code 3 operates freestanding emergency room facilities in Rockport, Mesquite, Carrolton, Denton, and McKinney, Texas, and at the Dallas Forth Worth International Airport.

24.     Blue Cross is a health insurer.  Upon information and belief, Defendant Blue Cross is a Mutual Legal Reserve Company organized under the laws of the State of Illinois, with

its principal place of business located in Illinois.  It operates a division that does business as "Blue Cross Blue Shield of Texas," based out of Richardson, Texas.

## III.    JURISDICTION AND VENUE

### A.    Diversity Jurisdiction

25.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1132, which provides the district courts with original jurisdiction over all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.

26.    Specifically, the amount in controversy exceeds $75,000, exclusive of interest and costs, since Code 3 seeks injunctive relief as well as monetary relief in the amount of at least $495,511.67, plus interest, attorneys' fees, and costs of suit.

27.    Moreover, this is a suit between citizens of different states.  Plaintiff Code 3 is a citizen of Texas and Delaware for purposes of diversity jurisdiction.  It is a Texas limited liability company whose sole member is C3EP Holdings, LLC, a Texas limited liability company.  The members of C3EP Holdings, LLC, in turn, are: (i) two Texas limited liability companies, the members of which are natural persons who are citizens of the State of Texas; (ii) two Texas professional limited liability companies, the members of which are also natural persons who are citizens of the State of Texas; (iii) three additional natural persons who are citizens of the State of Texas; and (iv) NH Code 3 Common, Inc., a Delaware corporation with its principal place of business in Texas.

28.    Further, upon information and belief and based on Defendant Blue Cross's representations in its papers in support of its Notice of Removal, defendant Blue Cross is a Mutual Legal Reserve Company organized under the laws of the State of Illinois, with its

principal place of business located in Illinois.  Thus, Blue Cross is a citizen of Illinois for purposes of diversity jurisdiction.

**B.    Federal Question Jurisdiction**

29.    The Court also has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132.

30.    Specifically, upon information and belief, and based on Blue Cross's representations in its Notice of Removal, at least some of the fully-funded HMO and PPO plans upon which Code 3's claims are based are employer-sponsored health benefit plans that provide coverage to eligible employees and, therefore, are governed by ERISA.

31.    Moreover, as Blue Cross acknowledges in its Notice of Removal, Code 3's claims against Blue Cross under its ERISA-governed HMO and PPO plans are enforceable under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), in that Code 3 has acquired derivative standing to enforce the plans' beneficiaries' claims under Blue Cross's ERISA-governed HMO and PPO plans by obtaining valid assignments of benefits, discussed more fully below.

**C.    Personal Jurisdiction and Venue**

32.    This Court has personal jurisdiction over Blue Cross.  Among other thing, it operates a division that does business as "Blue Cross Blue Shield of Texas," headquartered in Texas, and is the largest health insurer in the State of Texas.  Thus, Blue Cross's affiliations with the State of Texas are continuous and systematic so as to render it essentially home in the State of Texas and subject to personal jurisdiction on that basis alone.

33.      Additionally, this Court has personal jurisdiction over Blue Cross because it has sufficient minimum contacts with the State of Texas, and Blue Cross's activities within the State of Texas give rise to Code 3's claims.

34.      Venue is appropriate in this District because a substantial part of the events that give rise to this dispute occurred in the Southern District of Texas and within this Division of the Southern District of Texas.

## IV.    FACTUAL BACKGROUND

**A.    Code 3 and the Lifesaving Services It Provides**

35.      Code 3 is a Physician-Owned network of emergency room & urgent care clinics staffed by board-certified emergency medicine physicians.  (DeMoor Aff. ¶ 2).  Code 3's freestanding emergency rooms are all licensed in accordance with Chapter 254 of the Texas Insurance Code.  (Id.).  The Code 3 freestanding emergency rooms provide no other services besides emergent medical treatment to the Texas communities it serves.  (Id.).

36.      The Texas communities served by Code 3 are largely under serviced and without other access to emergent medical care.  For example, Rockport is a coastal community with a population of over 10,000 people.  (DeMoor Decl. at ¶ 4).  Code 3 opened its Rockport facility approximately two weeks before the Gulf Coast was ravaged by Hurricane Harvey.  (Id.).  Hurricane Harvey displaced 20% of the Rockport population and destroyed the only other critical care hospital in the area, Care Regional Medical Center.  (Id.).  As a result, the Code 3 Rockport facility is the only emergent care treatment facility in a 50 mile radius.  (Id.).  The Rockport community credits Code 3 with saving many lives and preventing additional suffering by the Rockport residents, who would have had no access to emergency medical treatment without the presence of the Rockport facility.  (Id.).

37.    For example, patient C.D.,[2] a resident of Rockport since 2004, suffered a head injury after a fall on wet concrete on September 9, 2018.   (See the Affidavit of C.D., attached to the DeMoor Aff. at Exhibit B, at ¶¶ 2 and 4.)  She cut her forehead and was suffering from headaches and neck pain.  (Id.).  As a result, she decided she needed immediate medical care and attention and went to Code 3 for treatment.  (Id.).  Code 3 performed a medical screening and stabilized C.D.'s emergency condition so that C.D. was safe to go home.  (Id. at ¶ 5).  C.D. believes that because Code 3 is the only emergency care facility within 50 miles from Rockport, if Code 3 had not been open in Rockport when she needed emergency care, her health would have been in serious jeopardy, and she could have suffered serious bodily impairment or dysfunction.  (Id. at ¶¶ 3 and 6).

38.    An additional example is patient S.R., a resident of Rockport since 2016.  (See the Affidavit of S.R., attached to the DeMoor Aff. at Exhibit C, ¶ 2).  On August 22, 2018, S.R. began to experience abdominal pain that remained unchanged for four days.  (Id. at ¶ 4).  S.R. has a history of immunosuppression, and so when the condition persisted for four days without change, he decided he needed immediate medical care and attention.  (Id.).  On August 26, 2018, he went to Code 3 for treatment.  (Id.).  Code 3 performed a medical screening and determined S.R. had bacterial gastroenteritis.  (Id. at ¶ 5).  Code 3 treated him and stabilized his condition so that he was safe to go home.  (Id.).  If Code 3 had not been open in Rockport when S.R. needed emergency care, because Code 3 is the only emergency care facility within 50 miles from Rockport, he expects that his health would have been in serious jeopardy, and that he could have suffered serious bodily impairment or dysfunction.  (Id. at ¶¶ 3 and 6).

---

[2] Patient names are abbreviated to protect private health information.

39.     In addition to patients like C.D. and S.R., the Rockport Code 3 freestanding emergency room facility has a large number of high acuity patients.  These patients would not only suffer a material deterioration without immediate emergency medical treatment, but would likely die in the time it would take to travel the approximately 50 miles to the nearest emergency care facility.  For a few recent examples:

- On September 6, 2018, a 75-year-old male with chest pain and shortness of breath presented to the Rockport Code 3 facility with vital signs showing oxygen saturation of 83%.  The patient noted to have Tension Pneumothorax, spontaneous in nature.  The patient received a chest tube in the emergency room and was stabilized.  A delay in access to care would have resulted in acute hypotension, worsening hypoxia and death.

- On October 14, 2018, another patient, a 2-year old male presented to the Code 3 emergency room complaining of a cough with shortness of breath.  Upon arrival, the patient's vital signs showed a heart rate of 150 and pulse oximetry of 88% on room air, respiratory rate of 60.  The patient was stabilized and observed and improved with nebulizer treatments, oxygen and steroids.  A 45 minute drive to the hospital could have been catastrophic.

- On October 31, 2018, a 61-year old female presented to the Rockport Code 3 freestanding emergency room facility with chest pain.  An EKG was performed immediately and within five minutes, the patient was diagnosed with ST-Elevation Myocardial Infarction with EKG changes actively evolving while in the emergency room.  The Patient was accepted for cath lab by Christus Spohn with HALO flight on the way.  Appropriate medications were administered in less than

15 minutes from arrival.  This patient would have still been driving and likely deceased prior to reaching the front door of the closest hospital.

40.    Code 3 also has urgent care facilities that provide non-emergent medical care to the communities it serves.  In fact, at each Code 3 location, there are urgent care and freestanding emergency room facilities.  There are signs upon entering the Code 3 facilities that direct patients to one side of the building for urgent care treatment or the other side for emergency care.  Patients often come to Code 3 seeking urgent care treatment.  However, in many instances where a patient seeks urgent care, the patient is transferred to the freestanding emergency room facility based on the severity of the patient's medical needs.  For a few recent examples, at the Rockport facility:

- On September 24, 2018, a 58-year old male patient presented to the Code 3 urgent care facility with chest discomfort.  He screened out of the urgent care and into the freestanding emergency room for stabilization before he was transferred to a hospital in Victoria, Texas for cardiologic intervention;

- On November 19, 2018, a 78-year old female presented to the Code 3 urgent care with a urinary tract infection for a second visit wanting new antibiotics.  The patient was acutely ill in the urgent care during outpatient treatment.  The patient was sent to the Code 3 freestanding emergency room facility for evaluation.  Dr. DeMoor treated patient who was a diabetic with SIRS criteria and elevated lactic acid.  The patient was diagnosed with pyelonephritis (inflamed kidneys).  Ultimately, the patient was treated and released after intravenous antibiotics and emergency room observation avoiding admission.

- On November 20, 2018, a 62-year-old male presented to the Code 3 urgent care with a cough. The patient's vital signs showed respiratory failure. The patient was screened out of the urgent care and into the Code 3 freestanding emergency room for immediate intervention. The patient was stabilized, observed and ultimately diagnosed with pneumonia.

**B.     The Code 3 Freestanding Emergency Rooms' Out-of-Network Status**

41.     Health care providers are either "in-network" or "out-of-network" with respect to insurance carriers. "In-network" or "participating" providers are those who contract with health insurers that require them to accept substantially discounted negotiated rates as payment in full for covered services.

42.     "Out-of-network" or "non-participating" providers are those who do not have contracts with insurance carriers to accept discounted rates and, instead, set their own charges for services based on a percentage of thereof. (See DeMoor Aff., ¶ 7). Code 3 is an out-of-network provider. (Id.).

43.     Despite Code 3's out-of-network status, Blue Cross Members regularly seek and receive medically necessary emergency treatment at the Code 3 freestanding emergency rooms. (Id.). Indeed, Code 3 has treated hundreds of Blue Cross Members since May 2015. (Id.).

**C.     The Blue Cross Plans Provide Coverage for the type of "Emergency Care" Provided by Code 3**

44.     The Blue Cross Plans provide Blue Cross Members with coverage for "Emergency Care," defined as:

> health care services provided in a Hospital emergency facility, **freestanding emergency medical care facility**, or comparable facility to evaluate and stabilize medical conditions of a recent onset and severity, including but not limited to severe pain, that would lead a **prudent layperson**, possessing an average knowledge of medicine and health, to believe that his condition, sickness, or

injury is of such a nature that failure to get immediate medical care could result in: placing the patient's health in serious jeopardy; serious impairment to bodily functions; serious dysfunction of any bodily organ or part; serious disfigurement; or in the case of a pregnant woman, serious jeopardy to the health of the fetus.

(See for example, exemplar Blue Cross HMO and PPO Plans, attached to the DeMoor Affidavit at Exhibit D, at p. 2, and Exhibit E at p. 54, respectively) (emphasis added).

45.     While the Blue Cross HMO Plans do not normally provide coverage for medical services provided by an out-of-network provider, the Blue Cross HMO Plans expressly provide for insurance coverage to Blue Cross Members who receive Emergency Care from an out-of-network provider, such as Code 3.  (See DeMoor Aff., Exhibit D, at p. 2).  Blue Cross PPO Plans also provide coverage for out-of-network Emergency Care.  (See DeMoor Aff., Exhibit E, p. 54).

46.     Blue Cross is also required to reimburse Code 3 for the Emergency Care provided to Blue Cross  Members under the Blue Cross  HMO Plans based on the greatest of the following rates: (1) the median amount negotiated with Participating Providers for emergency services furnished; (2) the amount for the Emergency Care service calculated using the same method the Plan generally uses to determine payments for non-Participating Provider services by substituting the Participating Providers cost-sharing provisions for the non-Participating Providers cost sharing provisions; (3) the amount that would be paid under Medicare for the Emergency Care; or (4) the agreed rate, or usual and customary ("UCR").  The Blue Cross Member is responsible for any in-network Copayment, Coinsurance and Deductible imposed with respect to the Member.  (See DeMoor Aff., Exhibit D, at 29).

47.     The Blue Cross PPO Plans require out-of-network Emergency Care providers, like Code 3, to be reimbursed at the same percentage as an in-network provider of the Allowable Amount.  The Allowable Amount for Emergency Care under the Blue Cross PPO Plans is the usual or customary charge.  (See DeMoor Aff., Exhibit E, at 8 and 62).

48.    Texas law provides that, for emergency services, Blue Cross Members must be held harmless by Blue Cross under fully-funded HMO and PPO plans for any amounts beyond the copayment, deductible, and coinsurance percentage as if the Blue Cross member sought treatment by an in-network provider or facility.  See 28 Tex. Admin. Code § 11.1611(d) (for HMO Plans); 28 Tex. Admin. Code § 3.3708(a)-(b) (for PPO Plans).

**D.    Code 3 Obtains Valid, Enforceable Assignments of Benefits From Blue Cross Members**

49.    Beneficiaries of the Blue Cross Plans who receive treatment at Code 3 sign an "Assignment of Benefits" form ("AOB") with Code 3, whereby the beneficiaries assign their benefits to Code 3 and authorize Code 3 to obtain direct payment from health care carriers, like those insured and administered by Blue Cross for services rendered.  (See DeMoor Aff., ¶ 16).  The AOB also authorizes Code 3, its agents, contractors and/or billing representatives, to act as the patient's agent for purposes of obtaining direct payment for the services provided.  (See exemplar AOBs attached as Exhibit F to the DeMoor Aff.).  The AOB forms signed by the Blue Cross Members who receive medically necessary covered services from Code 3 contain the following language:

> I assign Code 3 Emergency [  ] all right, title and interest in any and all health insurance and/or health plan proceeds/benefits from any plan(s) arising from the provision of any goods and services provided by Code 3 Emergency [  ] and/or physicians/health providers thereof.  This assignment is made in accordance with § 1204.054, Tex. Ins. Code.
>
> I also assign and transfer to Code 3 Emergency [  ] all rights, title, and interest in any claims against any health insurers, sponsors and/or plan administrators of any of my health benefits plans(s) arising from or pertaining to any wrongful acts and/or omission pertaining to any of said health/benefit plan(s) or health insurance policy(ies) including, but not limited to, claims for non-payment or underpayment of health provider invoices and claims.  I further expressly and knowingly assign all rights under my benefit plan and the Employee Retirement Income Security Act of 1974 to sue my benefit plan for any breach of its fiduciary duty.  By executing this assignment of benefits, I am directing the health

insurance carrier or other health benefit plan providing my coverage (including, but not limited to, any employers, employer group, or trust sponsored or offered plan), to pay Code 3 Emergency [  ].

(See id.).

**E.    Blue Cross Must Reimburse Code 3 Pursuant to the Texas Prompt Pay Act**

50.    The TPPA generally applies only to in-network providers.  However, there is an exception for out-of-network providers who provide emergency services required to be provided under federal or state law.   Texas Ins. Code. § 1301.069.   Code 3 is required to provide emergency treatment to Blue Cross Members under the Texas Free Standing Emergency Room Act.  Texas Health and Safety Code § 254.136; see also Texas Admin. Code § 131.46.   Section 843.351 states that "[t]he provisions of this subchapter relating to prompt payment by a health maintenance organization of a physician or provider and to verification of health care services apply to a physician or provider who" are out of network providers who provide emergency services.   Id.   Accordingly, Blue Cross is required to abide by the TPPA's statutory time limitations for reimbursement of Code 3's claims, submitted for the emergent medical treatment provided to Blue Cross Members under the Blue Cross Plans.  Tex. Ins. Code §§ 843.351 and 1301.169; Emerus Hospital Partners, LLC v. Health Care Service Corporation, 13 c 8906, 2014 WL 4214260 (N.D. Ill. Aug. 22, 2014).

51.    The TPPA defines "Emergency Care" as quoted under the Blue Cross Plans at paragraph 19, supra.  Tex. Ins. Code § 843.002; see § 1301.155.  The TPPA also defines a "freestanding emergency room" as a facility licensed under Chapter 254 [of the Texas Insurance Code], Health and Safety Code.  Tex. Ins. Code § 843.002.

52.    The TPPA requires that, upon submission of a clean claim prior to 95 days after the date of service, the Blue Cross Plans must reimburse any portion of Code 3 claims that are

clean and/or issue a denial for any portion the Blue Cross Plans will not pay, within 45 days. Tex. Ins. Code §§ 843.338 and 1301.102-103.

53.    The TPPA defines a "clean claim" as:

A nonelectronic claim by a physician or provider, other than an institutional provider, is a clean claim if the claim is submitted using the Centers for Medicare and Medicaid Services Form 1500 or, if adopted by the commissioner by rule, a successor to that form developed by the National Uniform Claim Committee or its successor.   An electronic claim by a physician or provider, other than an institutional provider, is a clean claim if the claim is submitted using the Professional 837 (ASC X12N 837) format or, if adopted by the commissioner by rule, a successor to that format adopted by the Centers for Medicare and Medicaid Services or its successor.

A nonelectronic claim by an institutional provider is a clean claim if the claim is submitted using the Centers for Medicare and Medicaid Services Form UB-92 or, if adopted by the commissioner by rule, a successor to that form developed by the National Uniform Billing Committee or its successor.   An electronic claim by an institutional provider is a clean claim if the claim is submitted using the Institutional 837 (ASC X12N 837) format or, if adopted by the commissioner by rule, a successor to that format adopted by the Centers for Medicare and Medicaid Services or its successor.

Tex. Ins. Code §§ 843.336 and 1301.131.

54.    The TPPA permits the Blue Cross Plans to make a one time request for additional medical information from Code 3.  The request must be made in writing prior to 30 days after receipt of the provider claim for reimbursement for Emergency Care.  The request must describe, with specificity, the clinical information requested and relate only to information the Blue Cross Plans can demonstrate is specific to the claim or related episode of care.  Code 3 is not required to provide an attachment that is not contained in, or is not in the process of being incorporated into, the patient's medical or billing record.  The Blue Cross Plans must reimburse Code 3 for the submitted claim within 15 days from receipt of the additional information.  Tex. Ins. Code §§ 843.3385 and 1301.1054.

55.     For untimely reimbursement by the Blue Cross Plans to Code 3, the TPPA provides for statutory penalties in addition to the appropriate reimbursement rate for the claim under the Blue Cross Plans.  The statutory penalty for late payments up to 45 days after the claim was due to be paid is 50% of the total charges billed by the provider, not to exceed $100,000. For claims paid from 46 days to 91 days from the payment due date, the penalty is 100% of the billed charges, not to exceed $200,000.  Any payment made after 91 days from the payment due date incurs an additional penalty of 18% per annum.  Tex. Ins. Code §§ 843.342 and 1301.137.

56.     Blue Cross is required to reimburse Code 3, a freestanding emergency room that provides Emergency Care to Blue Cross Members under the Blue Cross Plans, for the clean claims submitted for reimbursement, including the Code 3 Claims, pursuant to the reimbursement time limits under the TPPA.

**F.      For ERISA Plans, Blue Cross Must Provide Code 3 with a Full and Fair Review**

57.     Moreover, as noted above, based on Blue Cross's representations in its Notice of Removal, at least some of the fully-funded HMO and PPO plans upon which Code 3's claims are based are employer-sponsored health benefit plans governed by ERISA, for which Code 3 may pursue civil remedies under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a).  These civil remedies include, among other things, the right to recover benefits due under the terms of ERISA plans, 29 U.S.C. § 1132(a)(1)(B), and the right to obtain appropriate equitable relief to enjoin violations of ERISA and the terms of ERISA plans, 29 U.S.C. § 1132(a)(3).

58.     Among the requirements of ERISA that Code 3 may judicially enforce against Blue Cross are the procedural protections mandated by 29 U.S.C. § 1133 when an ERISA plan issues an "adverse benefit determination" ("ABD").  An ABD is "a denial, reduction, or

termination of, or a failure to provide or make payment (in whole or in part) for, a benefit" under an ERISA plan.   29 C.F.R. § 2560.503-1(m)(4).

59.    Specifically, upon issuing an ABD, an ERISA plan must provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133.

60.    ERISA regulations issued pursuant to 29 U.S.C. § 1133 explain that, when an administrator of an ERISA plan issues an ABD, it must provide written notification, in a manner calculated to be understood by the recipient, of the following:  (i) the specific reason(s) for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including notice that the claimant has a right to bring a claim under ERISA to challenge the decision; and (v) any internal rule, guideline, protocol, or other similar criterion [that] was relied upon in making the adverse determination.  29 C.F.R. § 2560-503.1(g)(1)(i)-(v).

61.    Moreover, these regulations make clear that, in the case of post-service claims submitted pursuant to group health plans, the required notification must be issued "within a reasonable period of time, but not later than 30 days after receipt of the claim."  29 C.F.R. § 2560-503.1(f)(2)(iii)(B).  This time period "may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary

due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision." Id. If such an extension is necessary "due to a failure of the claimant to submit the information necessary to decide the claim, the notice shall specifically describe the required information." Id.

**G.     The Blue Cross Process Threatens Patient Safety by Discouraging Patients From Seeking Emergency Medical Treatment**

62.     In an April 18, 2018 memorandum (the "April 18th Memo") to its producers and salespeople, Blue Cross announced that beginning on June 4, 2018, its fully insured group and retail HMO members may be responsible for their entire bill if they go to an out-of-network emergency department "as a convenience for a condition they don't think is serious or life-threatening." (See the April 18th Memo, attached as Exhibit G to the DeMoor Aff.).

63.     The April 18th Memo stated that the review process for claims incurred after June 4, 2018, would be to:

- Request medical records and an itemized bill for the claim. We will review each medical record to ensure the services our members receive are being accurately billed to minimize inappropriate charges. As part of the review, the member's symptoms and concerns will be reviewed in connection with their HMO plan;

-  Pend - not deny - claims while we review the claim;

- Review each claim using a multi-step process. (Id.).

64.     The April 18th Memo also stated that a claim will not be denied without a review by a licensed physician. Should the claim be denied, the member will have the same appeal rights as they currently have. (Id.).

65.     On May 16, 2018, Blue Cross provided responses to questions from the TDI regarding the Blue Cross Process. (See the May 16, 2018 Blue Cross responses to the TDI

attached as <u>Exhibit H</u> to the DeMoor Affidavit). The responses stated that the Blue Cross Process is only intended to apply to out-of-network ERs. Blue Cross explained that the Blue Cross Process would take place concurrently with claims processing and involve a review of Blue Cross Members' medical records for each claim prior to reimbursement. (<u>Id.</u>). Blue Cross also stated that "[a]dditional staff has been hired to accommodate the process of reviewing more medical records and claims." (<u>Id.</u>). Further, Blue Cross stated that the review would not be of the procedure codes billed upon discharge from the ER, but "the program is a review by [a Blue Cross employed] physician of the ER medical records to determine if the records reflect that a prudent layperson believed their condition required 'Emergency Care.'" (<u>Id.</u>).

**H.    The Effect of the Blue Cross Process on Code 3 Claims**

66.    While Blue Cross stated in the April 18th Memo that Blue Cross would implement the Blue Cross Process on or about June 4, 2018, Blue Cross later released a public statement advising that it would delay implementing the process until August 2018.

67.    After Blue Cross implemented the Blue Cross Process beginning in August 2018, it began to have a serious negative impact on Code 3's business and operations. At that point, in response to Code 3's clean claims for reimbursement submitted to Blue Cross, Blue Cross began to issue summary denials to Code 3 containing a "claim adjustment reason code" ("CARC") of "CO-252," which means that "an attachment is necessary in order to adjudicate this claim/service" on its electronic remittance advices ("ERA"). (<u>See</u> patient denial ERAs attached as <u>Exhibit I</u> to DeMoor Aff.).

68.    Blue Cross also included a "Remark Code," "M127," meaning "missing patient medical record for this service," on the "Patient Care Summary" forms it sent to Code 3. (<u>See</u> for example, <u>Exhibit J</u> to DeMoor Aff.). In addition, for some, but not all claims, Blue Cross's

"Customer Advocates" sent formal letters requesting an "Itemized Bill" and "Medical records for this patient" in order to "complete the processing of your claim." (See Customer Advocate letter attached as Exhibit K to the DeMoor Aff.).

69.    The requests for information on the ERAs and Customer Advocate letters received by Code 3 were identical for each claim and provided no information specific to the individual claims as required by the TPPA in order for justify Blue Cross's untimely payments on the grounds of a need for additional information. (See DeMoor Aff., ¶ 22).

70.    The requests for information on the ERAs and Customer Advocate letters likewise failed to include the information required by ERISA regulations to justify Blue Cross's refusal to process the claims, including, inter alia, a reference to the specific plan provisions upon which Blue Cross relied; an explanation of why Blue Cross needed the additional information it was requesting to perfect the claims; and any internal rule, guideline, protocol, or other similar criterion it was relying upon in making the adverse determination. See 29 C.F.R. § 2560-503.1(g)(1)(i)-(v).

71.    Blue Cross has applied, and continues to apply, the Blue Cross Process to all of Code 3's claims covered by fully funded HMO and PPO Plans. (Id.).

72.    Code 3 is also forced to incur additional administrative costs associated with the Blue Cross Process. (Id. at ¶ 23). In order to comply with the Blue Cross requests for additional information, two Code 3 staff members, in addition to their regular duties, must gather, copy and post the extensive and cumbersome medical documentation for every Code 3 claim submitted for reimbursement. (Id.).

73.    Notably, Blue Cross stated in its May 16, 2018, response letter to the TDI that it hired additional staff solely to review medical records under the Blue Cross Process. (See

DeMoor Aff. at <u>Exhibit</u> H).   On the other hand, Code 3, a small, independent provider of emergency services, cannot sustain such costs and should not be saddled with a drain on resources in order to pursue reimbursement on claims Blue Cross is already required to reimburse under the Blue Cross  Plans and the TPPA.   (DeMoor Aff., ¶ 23).

74.      While the vast majority of the Code 3 Claims remain unpaid, for those processed after Code 3 provided the additional information requested by Blue Cross, the claims were processed and paid well below that required by the Blue Cross Plans, especially for the Code 3 claims covered by the Blue Cross HMO Plans.  (<u>Id.</u> at ¶ 24).

75.      By letter to Code 3 dated August 3, 2018, Nancy Pruitt, Divisional Senior Vice President & Enterprise Plan Counsel for Blue Cross, explained that for claims covered under Blue Cross HMO Plans, in January 2018, Blue Cross revised its fee schedules to pay the "UCR" rate specified in the HMO Plans at Medicare-based rates.  Ms. Pruitt stated, without any basis, that these revisions brought out of network emergency HMO reimbursement in line with the most widely accepted basis for payment in health care.

## I.      Blue Cross Sends Harassing Requests for Medical Records to Code 3 Executives and Physicians

76.      Making Blue Cross's abusive tactics even worse, on or about August 10, 2018, Blue Cross sent separate letters requesting records for the husband and children of Code 3's president, Dr. Carrie DeMoor, to the Code 3 Carrolton and Craig Ranch facilities.  (<u>See</u> the August 10, 2018, Blue Cross letters attached as <u>Exhibit L</u> to the DeMoor Aff.).  These letters requested records for dates of service from July 1, 2014, to June 30, 2018.  (<u>Id.</u>).  Both letters were identical and incorrectly stated that "this request is consistent with the language in your network contract and BCBSTX Provider Manual …"   Code 3 and all of its freestanding

emergency room facilities, however, are out-of-network and do not have a network contract with Blue Cross. (See DeMoor Aff., ¶ 26 ).

77.    On or about August 13, 2018, Blue Cross sent another letter to Code 3 requesting Dr. DeMoor's personal medical records. (Id. at ¶ 27).

78.    A few days later, on August 15, 2018, Blue Cross faxed a request for medical records from January 1, 2017, through and including December 31, 2017, for the sister-in-law of a Code 3 Rockport physician, Dr. Peter Brokish, through a third-party, Inovalon. (See the August 15, 2018, fax from Inovalon, attached as Exhibit M to the DeMoor Aff.). This patient, however, was never treated at the Rockport facility and was not covered by Blue Cross for most of the year, as she resided out of state and only relocated to Texas mid-year. (Id. at ¶ 28).

79.    Blue Cross sent these requests with no valid business purpose but to intimidate and harass Code 3 in retaliation for Code 3's position regarding Code 3's underpaid and delayed claims for the emergent medically necessary treatment provided by Code to the Blue Cross Members.

**J.    Unless Restrained, Blue Cross's Conduct Will Continue to Threaten Patient Safety and the Viability of Code 3**

80.    The Blue Cross Process serves little purpose but to intentionally delay payment to drive freestanding emergency rooms like Code 3, out of business, and puts the Texas population at risk by denying the Blue Cross Member access to emergency healthcare. The Blue Cross Process directly conflicts with the prudent layperson standard. The Blue Cross Process creates doubt in a patient's ability to determine, in the moment, whether they are experiencing a medical emergency for fear that Blue Cross will later determine the patient's belief was incorrect and not cover the emergency treatment.

81.     This second-guessing will lead patients to delay or avoid seeking emergency services for fear of incurring large medical bills.  As stated in the Texas Medical Association's May 8, 2018, letter to TDI objecting to the Blue Cross Process:

> We do not believe patients should be expected to self-diagnose to determine whether their symptoms are serious enough to warrant an emergency department visit. But with this policy, [Blue Cross] is asking that patients act as highly trained diagnosticians, skills our members spent many years of their lives acquiring. [Blue Cross] is asking them to diagnose their symptoms at a critical and emotional moment, when time could be of the essence. As a result, it is very likely that extremely ill patients will not seek needed emergency medical care while, bluntly, their conditions worsen or they die.
>
> For example, when a person wonders if his or her chest pain is indigestion or a heart attack, will HMOs now be allowed now to penalize that person if he or she seeks care only to learn the ailment is the lesser concern? Or whether head trauma caused a concussion? Or whether abdominal pain is constipation or actually a dangerous appendicitis? To expand, we respectfully and specifically point you to an example [Blue Cross] cites in the attached memo. "Some of our members are using the emergency room for things like ... sprained ankles, for convenience rather than for serious or life-threatening issues."
>
> Mild or moderate ankle sprains can be treated simply with rest, ice, and at-home exercise. Some ankle injuries that present with similar symptoms, however, require immediate care. It is not reasonable for an HMO to expect that a "prudent layperson possessing an average knowledge of medicine and health," in significant pain, can differentiate between a sprain, a fractured bone in the ankle, and a dislocated ankle.
>
> Clearly, the purpose of the "prudent layperson" standard in the Texas HMO Act is to shield patients from having to make such specific self-diagnoses, and to encourage them to seek emergency care appropriately without having to have medical expertise or a detailed understanding of the law. Scaring them into avoiding emergency care seems a heavy-handed approach that could be detrimental to good patient care.

(See the May 8, 2018, letter to TDI attached as Exhibit N to the DeMoor Aff.).  The Blue Cross Plans and the TPPA make clear that Blue Cross may not, after the emergency treatment has been rendered, substitute its opinion of whether the patient experienced an "emergency" for the patient's subjective opinion.

82.     After implementing the Blue Cross Process, Blue Cross refused to adjudicate at least 48 Code 3 Claims until it received additional information to support medical necessity at the Emergency Care level.  The Blue Cross Process is a direct breach of the "prudent layperson standard" provisions in the Blue Cross Plans.   These provisions require that Blue Cross reimburse Code 3 at the rates provided in the Plans for the Emergency Care provided to Blue Cross Members.

83.     The wrongful delay of payment under the Blue Cross Process based on a request for additional information to determine medical necessity also violates the TPPA's timely payment requirements.

84.     Blue Cross's blanket refusal to process Code 3's claims based on a request for additional information to determine medical necessity also fails to comply with ERISA's statutory and regulatory mandates to provide Code 3 with a full and fair review.  29 U.S.C. § 1133; 29 C.F.R. § 2560-503.1.

85.     Accordingly, Code 3 has an outstanding balance of approximately $495,511.67 related to these claims, and continues to receive wrongful denials pending receipt of additional information.

86.     Absent continued judicial intervention, Blue Cross will continue its improper application of the Blue Cross Process, to the detriment of Code 3 and the patients it serves. Notably, in granting Code 3's request for an *ex parte* Temporary Restraining Order prior to the removal of this action to this Court, the District Court from the District Court of Aransas County, Texas, 36th Judicial District (Cause No. 18-0345), found that Blue Cross's continued application of the Blue Cross Process to Code 3's claims threatens the financial viability of Code 3's operations and presents a serious risk that Code 3 will be forced to cease operations in its

Rockport, Texas, location and elsewhere, leaving residents of Aransas County without adequate access to emergency medical care.   (ECF Doc. No. 1-2).

87.     Unless the restraints ordered by the Texas District Court continue, Blue Cross will be free to resume its improper application of the Blue Cross Process.  The Blue Cross Process has continued and will continue to have a serious detrimental impact on Code 3's ability to continue operations due to the delay in payment for Code 3's clean claims, underpayment of Code 3's claims and increased administrative costs incurred by Code 3 to comply with Blue Cross requests under the Blue Cross Process.  (See DeMoor Aff., ¶ 30).  The Blue Cross Process, if not enjoined, will also no doubt result in the injury or death of Blue Cross Members who will no longer have access to the emergency care provided by Code 3, and based on faulty advice provided by Blue Cross, will delay or avoid seeking necessary emergent medical treatment.  (Id. at ¶ 31).

## V.     CAUSES OF ACTION

### COUNT ONE:  BREACH OF THE BLUE CROSS PLANS

88.     Code 3 realleges and reincorporates the allegations of the preceding paragraphs as if fully set forth herein.

89.     Under Texas law, the elements of a cause of action for breach of contract claim are: 1) existence of a valid contract; 2) performance or tendered performance by the plaintiff; 3) material breach by the defendant; and 4) damages sustained by the plaintiff as a result of that breach. *Paragon Gen. Contractors, Inc. v. Larco Constr., Inc.*, 227 S.W.3d 876, 882 (Tex. App.-Dallas 2007, no pet.).

90.     As set forth more fully above, the Blue Cross Plans require reimbursement of Emergency Care Services incurred by Blue Cross Members for HMO Plans at the greatest of the

following rates:  the median in-network rate; the rate generally paid to out-of-network providers under the HMO Plans; the Medicare rates; or UCR; and for PPO Plans, at the usual or customary charge.  Further, under the terms of the Blue Cross Plans, Blue Cross Members are entitled to the coverage for the Emergency Care Services that they received under the prudent layperson standard from Code 3.

91.    By virtue of the "Assignment of Benefits" forms executed by Blue Cross Members, Code 3 was assigned the right to receive reimbursement under the Blue Cross Plans for the emergency services that it rendered to the Blue Cross Members.  Pursuant to said assignments of benefits, Blue Cross is contractually obligated to reimburse Code 3 for these services.

92.    Through implementation and application of the Blue Cross Process, Blue Cross failed to make payment of benefits to Code 3 for the Code 3 Claims in the manner and amounts required under the terms of the Blue Cross Plans.  This failure has resulted in a delay of payment and/or underpayment of clean claims submitted by Code 3 to Blue Cross for Emergency Care provided by Code 3 to Blue Cross Members under the Blue Cross Plans.  The Blue Cross Process has also resulted in a drain of valuable Code 3 administrative resources and additional costs regarding copying and posting the medical records sought by Blue Cross on every Code 3 claim covered by the Blue Cross  Plans.

93.    Unless restrained from implementing the Blue Cross Process, Blue Cross will remain in violation of the Blue Cross Plan provisions regarding coverage for Emergency Care under the "prudent layperson standard" and at the rates provided therein, which will result in irreparable harm for which there is no adequate remedy at law.  Specifically, among other things,

Code 3 will likely be forced to cease operations at its Rockport facility and elsewhere, leaving residents of Aransas County without access to emergency medical care.

94.     Accordingly, Code 3 is entitled to preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members.

95.     Furthermore, as the result of Blue Cross's failure to comply with the terms of the Blue Cross  Plans, Code 3, as assignee of the Blue Cross Members, has suffered damages and lost benefits, for which it is entitled to damages from Blue Cross, including unpaid benefits, restitution, interest, and other contractual damages sustained by Code 3.

### COUNT TWO:  VIOLATION OF THE TPPA

96.     Code 3 realleges and reincorporates the allegations of the preceding paragraphs as if fully set forth herein.

97.     As set forth more fully above, because Code 3 is required to provide Emergency Care to Blue Cross Members under the Texas Free Standing Emergency Room Act, Blue Cross must comply with the TPPA time limits for reimbursement of clean claims submitted by Code 3 for the Emergency Care provided to Blue Cross Members under the Blue Cross Plans.  Texas Ins. Code. § 1301.069 and 843.351.

98.     As set forth more fully above, the TPPA requires that clean claims submitted by providers for medical services, including Emergency Care Services, to an insurer must be paid within 45 days.

99.      The Code 3 Claims submitted to Blue Cross for reimbursement of Emergency Care services rendered to Blue Cross Members were clean claims that were timely submitted

within 95 days from the date of service pursuant to Tex. Ins. Code Sections 843.336 and 1301.131.

100.    As set forth more fully above, Blue Cross denied all of the Code 3 Claims using a CARC 252 denial code and requested additional information in order to process the Code 3 Claims.  These requests failed to meet the specificity requirements of the TPPA at Tex. Ins. Code Sections 843.3385 and 1301.1054.

101.    As a result of Blue Cross's improper request for information, Blue Cross failed to reimburse Code 3 within 45 days from the date of submission of the Code 3 Claims in violation of the TPPA, at Tex. Ins. Code Sections 843.338 and 1301.102-103.

102.    Blue Cross's failure to comply with the TPPA has resulted in a delay of payment and/or underpayment of clean claims submitted by Code 3 to Blue Cross for Emergency Care provided by Code 3 to Blue Cross Members. The Blue Cross Process has also resulted in a drain of valuable Code 3 administrative resources and additional costs regarding copying and posting the medical records sought by Blue Cross on every Code 3 claim covered by the Blue Cross Plans.

103.    Unless restrained from implementing the Blue Cross Process, Blue Cross will remain in violation of the TPPA, which will result in irreparable harm for which there is no adequate remedy at law.  Specifically, among other things, Code 3 will likely be forced to cease operations at its Rockport facility and elsewhere, leaving residents of Aransas County without access to emergency medical care.

104.    Accordingly, Blue Cross is entitled to preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members; and enjoining

Blue Cross from requesting additional medical records for Code 3 claims submitted under the Blue Cross Plans unless each such request describes, with specificity, the clinical information requested and relates only to information the Blue Cross Plans can demonstrate is specific to the claim or related episode of care, as required by Tex. Ins. Code §§ 843.3385 and 1301.1054..

105.    Furthermore, as the result of Blue Cross's failure to comply with the statutory requirements under the TPPA, Code 3 is entitled to statutory penalties under Texas Ins. Code Sections 843.342 and 1301.137.

## COUNT THREE:  CLAIM FOR BENEFITS DUE UNDER ERISA PLANS

106.    Code 3 realleges and reincorporates the allegations of the preceding paragraphs as if fully set forth herein.

107.    Upon information and belief, based on representations by Blue Cross in its Notice of Removal, at least some of the Blue Cross Plans are employer-sponsored health benefit plans governed by ERISA, for which Code 3 may pursue civil remedies under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a).  These civil remedies include, among other things, the right to recover benefits due under the terms of ERISA plans, 29 U.S.C. § 1132(a)(1)(B).

108.    As set forth more fully above, the Blue Cross Plans require reimbursement of Emergency Care Services incurred by Blue Cross Members for HMO Plans at the greatest of the following rates:  the median in-network rate; the rate generally paid to out-of-network providers under the HMO Plans; the Medicare rates; or UCR; and for PPO Plans, at the usual or customary charge.  Further, under the terms of the Blue Cross Plans, Blue Cross Members are entitled to the coverage for the Emergency Care Services that they received under the prudent layperson standard from Code 3.

109.   By virtue of the "Assignment of Benefits" forms executed by Blue Cross Members, Code 3 was assigned the right to receive reimbursement under the Blue Cross Plans for the emergency services that it rendered to the Blue Cross Members.   As Blue Cross acknowledges in its Notice of Removal, pursuant to these "Assignment of Benefits" forms, Code 3 has acquired derivative standing to enforce the plans' beneficiaries' claims under Blue Cross's ERISA-governed HMO and PPO plans.

110.   Through implementation and application of the Blue Cross Process, Blue Cross failed to make payment of benefits to Code 3 for the Code 3 Claims in the manner and amounts required under the terms of the Blue Cross Plans.   This failure results in a delay of payment and/or underpayment of clean claims submitted by Code 3 to Blue Cross for Emergency Care provided by Code 3 to Blue Cross Members under the Blue Cross Plans. The Blue Cross Process also results in a drain of valuable Code 3 administrative resources and additional costs regarding copying and posting the medical records sought by Blue Cross on every Code 3 claim covered by the Blue Cross  Plans.

111.   Unless restrained from implementing the Blue Cross Process, Blue Cross will remain in violation of the Blue Cross Plan provisions regarding coverage for Emergency Care under the "prudent layperson standard" and at the rates provided therein, which will result in irreparable harm for which there is no adequate remedy at law.  Specifically, among other things, Code 3 will likely be forced to cease operations at its Rockport facility and elsewhere, leaving residents of Aransas County without access to emergency medical care.

112.   Accordingly, Code 3 is entitled to preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members.

113.    Furthermore, as the result of Blue Cross's failure to comply with the terms of the ERISA-governed Blue Cross Plans, Code 3, as assignee of the Blue Cross Members, has suffered damages and lost benefits as assignee, for which it is entitled to benefits due from Blue Cross under the terms of the Blue Cross Plans, other declaratory and injunctive relief related to enforcement of the terms of the Blue Cross Plans, clarification of future benefits, restitution, interest, attorneys' fees, and other penalties as this Court deems just under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

## COUNT FOUR:  BREACH OF ERISA FIDUCIARY DUTIES

114.    Code 3 realleges and reincorporates the allegations of the preceding paragraphs as if fully set forth herein.

115.    Upon information and belief, based on representations by Blue Cross in its Notice of Removal, at least some of the Blue Cross Plans are employer-sponsored health benefit plans governed by ERISA, for which Code 3 may pursue civil remedies under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a).  These civil remedies include, among other things, the right to obtain appropriate equitable relief to enjoin violations of ERISA and the terms of ERISA plans, 29 U.S.C. § 1132(a)(3).

116.    Blue Cross, as the sponsor of the Blue Cross Plans, exercises discretionary authority or discretionary control relating to the management and/or administration of the Blue Cross Plans, and/or exercises authority and/or control respecting the management and disposition of the Blue Cross Plans' assets.  Accordingly, Blue Cross is a fiduciary of the ERISA-governed Blue Cross Plans within the meaning of 29 U.S.C. § 1002(21)(A).

117.    As a fiduciary of the Blue Cross Plans, Blue Cross owes the beneficiaries of the Blue Cross Plans -- including Code 3, as assignee of the Blue Cross Plans -- a duty to act for the

exclusive purpose of providing benefits to participants and their beneficiaries, with the care, skill, prudence, and diligence that a prudent administrator would use in the conduct of an enterprise of like character; and in accordance with the Plan documents.   29 U.S.C. § 1104(a)(1)(A), (B), (D).

118.    Through implementation of the Blue Cross Process, Blue Cross violated its fiduciary duties to beneficiaries of the Blue Cross Plans -- including Code 3 as assignees of beneficiaries' rights under the Blue Cross Plans.   Blue Cross did so by, among other things: basing its reimbursement decisions on maximizing profits to Blue Cross rather than on the terms of the Blue Cross Plans and applicable statutes and regulations; failing to make decisions in the interests of beneficiaries; failing to act in accordance with the Blue Cross Plan documents; failing to inform Code 3 -- as assignee of the Blue Cross Members' rights under the Blue Cross Plans -- of material information; misrepresenting requirements for reimbursement under the Blue Cross Plans; and imposing unduly burdensome preconditions to payment not contemplated by the Blue Cross Plans.

119.    Unless restrained from implementing the Blue Cross Process, Blue Cross will continue to violate its fiduciary duties to beneficiaries of the Blue Cross Plans -- including Code 3 as assignee of beneficiaries' rights under the Blue Cross Plans -- which will result in irreparable harm for which there is no adequate remedy at law.   Specifically, among other things, Code 3 will likely be forced to cease operations at its Rockport facility and elsewhere, leaving residents of Aransas County without access to emergency medical care.

120.    Accordingly, Code 3 is entitled to preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members.

121.    Furthermore, as the result of Blue Cross's failure to comply with its fiduciary duties under 29 U.S.C. § 1104, Code 3, as assignee of the Blue Cross Members under the ERISA-governed Blue Cross Plans, Code 3 is entitled to other appropriate equitable relief under 29 U.S.C. § 1132(a)(3) to redress Blue Cross's violations.

### COUNT FIVE:  DENIAL OF FULL AND FAIR REVIEW

122.    Code 3 realleges and reincorporates the allegations of the preceding paragraphs as if fully set forth herein.

123.    Upon information and belief, based on representations by Blue Cross in its Notice of Removal, at least some of the Blue Cross Plans are employer-sponsored health benefit plans governed by ERISA, for which Code 3 may pursue civil remedies under ERISA's civil enforcement provision, 29 U.S.C. § 1132(a).  Again, these civil remedies include, among other things, the right to obtain appropriate equitable relief to enjoin violations of ERISA and the terms of ERISA plans, 29 U.S.C. § 1132(a)(3).

124.    Blue Cross, as the sponsor of the Blue Cross Plans, is required to provide, in accordance with regulations of the Secretary of Labor, the procedural protections mandated by 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1 when an ERISA plan issues an ABD.

125.    These procedural protections include, among other things, adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, and written in a manner calculated to be understood by the participant; and a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim. 29 U.S.C. § 1133.

126.    The written notice mandated by 29 U.S.C. § 1133 must contain, *inter alia*, (i) the specific reason(s) for the adverse determination; (ii) reference to the specific plan provisions on which the determination is based; (iii) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material is necessary; (iv) a description of the plan's review procedures and the time limits applicable to such procedures, including notice that the claimant has a right to bring a claim under ERISA to challenge the decision; and (v) any internal rule, guideline, protocol, or other similar criterion [that] was relied upon in making the adverse determination.  29 C.F.R. § 2560-503.1(g)(1)(i)-(v).

127.    The required written notice must be issued "within a reasonable period of time, but not later than 30 days after receipt of the claim."  29 C.F.R. § 2560-503.1(f)(2)(iii)(B).  This time period "may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision."  Id.  If such an extension is necessary "due to a failure of the claimant to submit the information necessary to decide the claim, the notice shall specifically describe the required information."  Id.

128.    Blue Cross's across-the-board refusal, pursuant to the Blue Cross Process, to process Code 3's claims pending a request for and receipt of additional information to determine medical necessity is completely noncompliant with its statutory and regulatory duty to provide Code 3 with a full and fair review, as required by 29 U.S.C. § 1133 and 29 C.F.R. § 2560-503.1.

129.    Notably, by summarily refusing to process the Code 3 Claims pending receipt of additional information to determine medical necessity, Blue Cross is issuing ABDs without

complying with the regulatory requirements, <u>inter alia</u>, to include:  a reference to the specific plan provisions upon which Blue Cross relied; an explanation of why Blue Cross needed the additional information it was requesting to perfect the claims; and any internal rule, guideline, protocol, or other similar criterion it was relying upon in making the adverse determination.  <u>See</u> 29 C.F.R. § 2560-503.1(g)(1)(i)-(v).

130.    Furthermore, Blue Cross's summary refusal to process the Code 3 Claims pending receipt of additional information to determine medical necessity necessarily means that Blue Cross is failing to provide the requisite written notice "within a reasonable period of time, but not later than 30 days after receipt of the claim," which time period "may be extended one time by the plan for up to 15 days, provided that the plan administrator both determines that such an extension is necessary due to matters beyond the control of the plan and notifies the claimant, prior to the expiration of the initial 30-day period, of the circumstances requiring the extension of time and the date by which the plan expects to render a decision."  29 C.F.R. § 2560-503.1(f)(2)(iii)(B).

131.    Unless restrained from implementing the Blue Cross Process, Blue Cross will continue to violate its statutory and regulatory obligations with respect to ABDs under 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1, which will result in irreparable harm for which there is no adequate remedy at law.  Specifically, among other things, Code 3 will likely be forced to cease operations at its Rockport facility and elsewhere, leaving residents of Aransas County without access to emergency medical care.

132.    Accordingly, Code 3 is entitled to preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members.

133.   Furthermore, as the result of Blue Cross's failure to comply with its statutory and regulatory obligations with respect to ABDs under 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1, Code 3, as assignee of the Blue Cross Members, is entitled to appropriate equitable relief under 29 U.S.C. § 1132(a)(3).

## VI.   CONDITIONS PRECEDENT

134.   All conditions precedent have been performed or have occurred.

## VII.   JURY DEMAND

135.   Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Code 3 hereby requests a trial by jury on all issues so triable.

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Code 3 respectfully requests judgment in its favor and against Blue Cross as follows:

A.   Preliminary and permanent injunctive relief, enjoining Blue Cross from applying the Blue Cross Process to claims submitted by Code 3 for reimbursement for Emergency Care services rendered to Blue Cross Members according to the prudent layperson standard as defined in the Blue Cross Plans and the Texas Insurance Code;

B.   Preliminary and permanent injunctive relief, enjoining Blue Cross from requesting additional medical records for Code 3 claims submitted under the Blue Cross Plans unless each such request describes, with specificity, the clinical information requested and relates only to information the Blue Cross Plans can demonstrate is specific to the claim or related episode of care, as required by the TPPA, at Tex. Ins. Code §§ 843.3385 and 1301.1054;

C.   Damages from Blue Cross, including unpaid benefits, restitution, interest, and other contractual damages sustained by Code 3, as the result of Blue Cross's failure to comply

with the terms of the Blue Cross Plans;

  D. Statutory penalties under Texas Ins. Code Sections 843.342 and 1301.137, as the result of Blue Cross's failure to comply with the TPPA;

  E. With respect to the Blue Cross Plans governed by ERISA, benefits due from Blue Cross under the terms of the Blue Cross Plans, other declaratory and injunctive relief related to enforcement of the terms of the Blue Cross Plans, clarification of future benefits, restitution, interest, attorneys' fees, and other penalties as this Court deems just under ERISA Section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B);

  F. With respect to the Blue Cross Plans governed by ERISA, other appropriate equitable relief, under 29 U.S.C. § 1132(a)(3), to redress Blue Cross's violations of its fiduciary duties under 29 U.S.C. § 1104;

  G. With respect to the Blue Cross Plans governed by ERISA, other appropriate equitable relief, under 29 U.S.C. § 1132(a)(3), to redress Blue Cross's failure to comply with its statutory and regulatory obligations with respect to ABDs under 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1;

  H. Code 3's reasonable attorneys' fees, as provided by the TPPA and § 502(g) of ERISA, 29 U.S.C. § 1132(g);

  I. Code 3's costs of suit;

  J. An award in favor of Code 3 of pre-judgment and post-judgment interest; and

  K. Such other further relief to which Code 3 may show itself entitled.

Respectfully submitted,

K&L GATES LLP

*/s/ Artoush Varshosaz*
Artoush Varshosaz
State Bar No. 24066234
artoush.varshosaz@klgates.com
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5500
(214) 939-5849 (fax)

DONNELL, ABERNETHY &
KIESCHNICK, P.C.

*Ben A. Donnell*_____
Ben A. Donnell
State Bar No. 05978000
Federal Bar No. 5689
bdonnell@dakpc.com
**Donnell, Abernethy & Kieschnick, P.C.**
555 N. Carancahua St # 400
Corpus Christi, Texas 78401
Phone: (361) 888-5551
Fax: (361) 880-5618

*Attorneys for Plaintiff*
*Code 3 Emergency Partners, LLC*

Dated: December 24, 2018